UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

HERMAN BYRD,
    Plaintiff,

vs.                                              10-1058

WEXFORD HEALTH SOURCE, INC., et al.
    Defendants.

### MERIT REVIEW ORDER

This cause is before the court for a merit review of the plaintiff's claims. The court is required by 28 U.S.C. §1915A to "screen" the plaintiff's complaint, and through such process to identify and dismiss any legally insufficient claim, or the entire action if warranted. A claim is legally insufficient if it "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. §1915A.

The pro se plaintiff has filed a complaint pursuant to 42 U.S.C.§1983 against 15 defendants including Wexford Health Sources, Dr. Osapho, Dr. Shaffer, David Hopkins, Administrative Review Board Members Jackie Miller and Sarah Johnson, Correctional Officers Hobbs and Fefi, Nurse Sherri Lynn, Warden Kevin Gilson, Kevin Kirkbride, Dr. Peters, Nurse Huggins, the Illinois Department of Corrections and Stateville Correctional Center's doctor. The plaintiff has filed a very detailed complaint claiming that the defendants were deliberately indifferent to his serious medical condition in violation of the Eighth Amendment.

In order to demonstrate the defendants violated his Eighth Amendment rights, the plaintiff must pass a two prong test. First, the plaintiff must demonstrate that he suffers from a serious medical condition. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). Second, the plaintiff must demonstrate that the named defendants were deliberately indifferent to that condition. "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

STATEVILLE CORRECTIONAL CENTER

The plaintiff claims he suffers from severe hypertension and heart problems. When he entered the Illinois Department of Corrections, the plaintiff says he saw a doctor at Stateville Correctional Center on October 22, 2007. The plaintiff says he told the doctor about his

condition and the medications he was on. The doctor said the Illinois Department of Corrections would not pay for the medications currently diagnosed. Instead, the doctor changed one medication from patch form to pill form and changed one medication to a different prescription. The plaintiff told the doctor his personal care physician had spent some time coming up with the correct mix of medications. The doctor told the plaintiff that he was about to be transferred out of Stateville Correctional Center and the plaintiff could discuss his condition more in depth with his next doctor. The plaintiff says he was then transferred to Illinois River Correctional Center.

The plaintiff has failed to state a violation of his constitutional rights. A disagreement with the type of care or prescription provided by this doctor is not enough to state an Eighth Amendment claim. In addition, the plaintiff cannot combine unrelated claims against unrelated defendants in the same lawsuit. The plaintiff cannot combine his claims against this doctor at Stateville Correctional Center with claims against individuals at Illinois River Correctional Center. In *George v Smith,* 507 F.3d 605, 607 (7th Cir. 2007), the Court of Appeals stated that "[u]nrelated claims against different defendants belong in different suits." In other words, "multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. *Id.* The Seventh Circuit has instructed that such "buckshot" complaints should be "rejected." *Id.*

In addition, venue for this claim does not lie in the Central District of Illinois. Venue for federal civil rights actions brought under 42 U.S.C. § 1983 is governed by 28 U.S.C. § 1391(b). According to that statute, such actions may be brought only in (1) the judicial district where any defendant resides (if all defendants reside in the same State), (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

The plaintiff's claims involving his care at Stateville Correctional Center occurred in Will County which is situated in the federal judicial district for the Northern District of Illinois. 28U.S.C. § 93c . If venue is improper the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. §1406 (a). The court cannot transfer the plaintiff's case to the Northern District because he has chosen to combine claims that involve both districts in his complaint. Therefore, the court will dismiss any claims concerning his treatment at Stateville Correctional Center. If the plaintiff believes he can state a violation of his constitutional rights, he may file a separate lawsuit concerning these claims involving Dr. Peters and the other, unknown Stateville doctor in the Northern District of Illinois.

ILLINOIS RIVER CORRECTIONAL CENTER.

The remainder of the plaintiff's complaint lists a detailed account of the medical care he received at Illinois River Correctional Center. The plaintiff says he initially complained that he was having breathing problems, but the nurses who examined him were unable to detect any problems. The plaintiff was told to fill out a sick call request if needed.

The plaintiff did see a nurse during sick call that examined the plaintiff and found no abnormalities. She told the plaintiff if he had any further problems to fill out a sick call request and he would be put on the doctor's sheet.

DR. OSAPHO:   Approximately one week later, in October of 2007, the plaintiff saw Dr. Osapho. The plaintiff explained his complaint about the change in his medications and his breathing problems. The doctor said he saw no reason to change the prescription and saw no signs of congestion. In addition, the plaintiff admits "my vitals and blood pressure were fine upon examination this time." (Comp, p. 7). The plaintiff asked the doctor to check into his medical history, but the doctor said it was not necessary. The doctor resigned shortly after this visit and the plaintiff had no further contact with him.

The plaintiff has failed to state a claim against this defendant based on the facts alleged in his complaint. The plaintiff was not denied care. He disagreed with his care. *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir. 1991)(differences in opinion between an inmate and medical staff do not rise to the level of an Eighth Amendment violation.)  In addition, the plaintiff admits he was not showing any signs that he was suffering from a serious medical condition at this time. This one appointment with Dr. Osapho does not rise to the level of an Eighth Amendment violation. The court will dismiss this defendant.

NURSE HUGGINS:   The plaintiff says his breathing problems continued and he began to feel like he was going to pass out. He again asked to be taken to the health care unit and was seen by Nurse Huggins. She noted that the plaintiff's blood pressure was up. The plaintiff stated that he had not had one of his medications, Vermipril, for a few days and his shortness of breath had gotten worse. The nurse got the medication for the plaintiff, had him take it and monitored him for the next hour. The plaintiff admits he began to feel better, and the nurse said she would schedule the plaintiff to see a doctor for his prescription. The nurse also told the plaintiff that if he had this problem again, he should report immediately to sick call.

This is the only mention of Nurse Huggins in the plaintiff's complaint. Nurse Huggins examined the plaintiff, provided care and scheduled him for a follow-up with a doctor. Once again, this incident does not rise to the level of an Eighth Amendment violation. The court will dismiss Defendant Huggins.

DR. SHAFFER: The plaintiff was seen by Dr. Shaffer three days later.   The plaintiff outlined his medical problems with the doctor. Dr. Shaffer reviewed the plaintiff's medical chart and said his blood pressure was currently fine. The doctor said he believed the plaintiff's prescription for Vermipril should be discontinued "based on the interpretation he made from the readings of my chart." (Comp, p. 8).  The plaintiff stated that he had suffered from congestive heart failure in the past and he was concerned that he was having the same problem. The doctor stated that he did not believe the plaintiff was suffering from this condition based on his observations of the plaintiff. Nonetheless, the doctor ordered X-rays of the plaintiff.

The plaintiff says he did not receive the X-ray, so one week later again asked for sick

call.
Nurse Howarter confirmed that Dr. Shaffer had ordered the X-ray and she did not know why one had not been scheduled. The X-rays were taken and the plaintiff was told to return to his cell and wait for the results. The plaintiff said he told the nurse about his shortness of breath, but the nurse told him she had found nothing wrong and neither had the doctor.

The next day the plaintiff put in for sick call again was seen again by Nurse Yetton. The nurse said his blood work showed abnormalities. That information coupled with his EKG lead her to believe the plaintiff's difficulty breathing was due to an enlarged heart. The plaintiff was admitted to the infirmary and continued to suffer with breathing problems for which he received treatment.

The next day, Nurse Yetton spoke to the plaintiff and told him that his "condition was much worse than what had been initially diagnosed by Doctor Shaffer or worse than what he thought and that I would have to be admitted full-time in the infirmary until I was seen by a Cardiologist." (Comp, p. 10)

The plaintiff was sent to an outside hospital the next week for a Cardio-Echo and it was discovered that the plaintiff's heart had been severely enlarged. Additional testing was requested to see if there was any damage to the plaintiff's kidneys "due to the misdiagnosis of the previous doctor." (Comp, p. 10). Although the plaintiff does not provide exact dates, it appears these incidents occurred in approximately November or December of 2007.

The plaintiff has attached a February 23, 2009 medical report from Graham Hospital in which the plaintiff was reporting to the hospital for a follow up visit. The report notes that the plaintiff exercises daily and suffers from no breathing problems. The plaintiff states he "feels great." (Comp, Feb. 23, 2009 Med. Report). The plaintiff remains on medication for his heart condition. The report notes that the plaintiff suffers from diabetes and Hypertrophic Cardiomyopathy, or thickening of the heart muscle.

Based on the allegations in the complaint, the plaintiff has failed to state that Dr. Shaffer violated his constitutional rights. Even if the doctor's original diagnosis was incorrect, he still ordered X-rays to double check his conclusion. While the plaintiff says the X-rays were delayed one week, that does not appear to be due to Dr. Shaffer and at most, demonstrates negligence. Once the X-ray was performed, the plaintiff was properly diagnosed and immediately received treatment. He was seen by a cardiologist within a week. Whenever the plaintiff complained about breathing problems, he was seen by medical staff and provided care. Although the plaintiff disagrees with the prescription change, he has not adequately alleged deliberate indifference and this claim must be dismissed.

The plaintiff concludes his complaint with several allegations about untimely medication after he was treated by the cardiologist:

OFFICER FEFI: On June 30, 2008, the plaintiff claims Officer Fefi denied the plaintiff his

prescribed medication.   However, the plaintiff goes on to explain that he told the officer he had not taken his 11:00 a.m. prescription, the officer stated that the Health Care Unit was running behind and had not called for him yet.  The Officer stated she had no control over the medical staff.  The plaintiff told the officer it was important to receive the medication on time.  At 1:30 p..m. the Officer called the Health Care Unit to check.   The plaintiff was then authorized to receive his medication.

DAVID HOPKINS: The plaintiff says on June 30, 2008, when he was allowed to get his prescription, Officer Hopkins asked the plaintiff why he had not arrived on time.   The plaintiff explained the problem and Officer Hopkins told the plaintiff it was his responsibility to get to the Health Care Unit on time.

SHERRI LYNN STOKES: The plaintiff complained to the Director of Nursing, Sherri Lynn Stokes, about the late medication.  She told the plaintiff that to her knowledge the med-line was calling inmates as scheduled, and the plaintiff should file a grievance concerning his problem.

OFFICER HOBBS: On September 26, 2008, the plaintiff says Officer Hobbs did not call the medication line at 11:00.   When the plaintiff asked, Officer Hobbs said the Health Care Unit had not called for the plaintiff.  The officer then took his lunch break and was replaced by a different officer.   The plaintiff asked this officer to call the Health Care Unit, and the plaintiff was told to report immediately.

NURSE HOWARTER:   When the plaintiff arrived at the Health Care Unit, Nurse Howarter told the plaintiff that the 11:00 med-line had been called and all other units had arrived on time.  The plaintiff explained about the problem with Officer Hobbs, and the nurse simply wished him luck in dealing with the problem.

　　　　While the med-line system described certainly leaves something to be desired, the plaintiff has not articulated a violation of his constitutional rights.  "[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill.  2001) *citing Ford,* 2001 WL 456427 at 6.   However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

　　　　The plaintiff has not alleged that the minimal delays had any detrimental effect and instead has provided a medical report that demonstrates that the plaintiff is doing well.  The court also notes that the delays seem to have more to do with mis-communication and negligence than deliberate indifference to the plaintiff's medical condition.

　　　　Finally, the plaintiff's complaint makes no mention of the following defendants: Wexford Health Sources, Administrative Review Board Members Jackie Miller and Sarah Johnson, Warden Kevin Gilson, and Kevin Kirkbride.  The court must dismiss the plaintiff's

complaint for failure to state a claim upon which relief can be granted.

**IT IS THEREFORE ORDERED that:**

1) **The plaintiff's complaint is dismissed for failure to state a claim pursuant to Fed. R. Civ. Proc. 12(b)(6) and 28 U.S.C. Section 1915A. This case is closed, with the parties to bear their own costs.**

2) **This dismissal shall count as one of the plaintiff's three allotted strikes pursuant to 28 U.S.C. Section 1915(g). The clerk of the court is directed to record the plaintiff's strike in the three-strike log.**

3) **The plaintiff must still pay the full docketing fee of $350.00 even though his case has been dismissed. The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $350.00.**

4) **The plaintiff is ordered to notify the clerk of the court of a change of address and phone number within seven days of such change.**

5) **The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

6) **If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)©. If the plaintiff does choose to appeal, he will be liable for the $455 appellate filing fee irrespective of the outcome of the appeal.**

Entered this 6th day of May, 2010.

\s\Harold A. Baker

_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE